NOT YET SCHEDULED FOR ORAL ARGUMENT

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

No. 23-5009

Animal Legal Defense Fund,
Plaintiff-Appellant,

v.

United States Department of Agriculture,
Food Safety Inspection Service, and Thomas Vilsack,
Defendants-Appellees.

---

Appeal from the United States District Court
for the District of Columbia

---

## BRIEF FOR APPELLANT

---

Caitlin Foley
Animal Legal Defense Fund
150 South Wacker Drive
Suite 2400
Chicago, IL 60606

Emily Stewart
Animal Legal Defense Fund
888-C 8th Avenue, #419
New York, NY 10019

Daniel H. Waltz
Animal Legal Defense Fund
700 Pennsylvania Ave SE
Washington, DC 20003
(707) 795-2533
dwaltz@aldf.org

*Counsel for Plaintiff-Appellant Animal Legal Defense Fund*

April 18, 2023

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**1. Parties.**

The parties before the District Court, and who are also parties in this Court, are: Plaintiff-Appellant Animal Legal Defense Fund, Defendant-Appellee U.S. Department of Agriculture, Defendant-Appellee Food Safety Inspection Service, and Defendant-Appellee Thomas Vilsack, in his official capacity as Secretary of the U.S. Department of Agriculture. There were no amici in the District Court, and there are currently none in this Court.

**2. Rulings under Review.**

The rulings under review are the Memorandum Opinion and Order entered by the United States District Court for the District of Columbia on November 14, 2022, granting Defendants' Motion to Dismiss.

**3. Related Cases.**

This case has not previously been before this Court. There are no pending related cases.

i

## TABLE OF CONTENTS

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES** ....... i

**TABLE OF CONTENTS** ...................................................................... ii

**TABLE OF AUTHORITIES** ............................................................... iv

**GLOSSARY** ........................................................................................ ix

**JURISDICTIONAL STATEMENT** ....................................................1

**STATEMENT OF THE ISSUES** ........................................................1

**STATEMENT OF THE CASE** ...........................................................2

    **A.**    **Statutory and Regulatory Background** ...................................2

    **B.**    **Factual Background** .................................................................3

        1.  FSIS approves Perdue labels depicting chickens and turkeys frolicking outside despite knowing that Perdue grows the birds indoors in windowless factories. ....................................................3

        2.  FSIS rejects ALDF's request that it stop approving misleading Perdue labels and explains it does not consider graphic imagery when reviewing poultry labels. ...................................................6

        3.  ALDF member Marie Mastracco's purchases of deceptively labeled Perdue products destroy her confidence in the raising conditions of the products she buys. .........................................7

    **C.**    **Procedural Background** ...........................................................9

**SUMMARY OF ARGUMENT** ...........................................................11

//

**ARGUMENT** ...................................................................................13

**A.**   **A Misled Consumer Who Lacks Confidence in Purchasing
         Decisions Can Have Standing.**...............................................13

1.  Mastracco's inability to rely on product labeling with any
    confidence is a concrete and imminent injury. ..........................13

2.  ALDF is entitled to injunctive relief based on Mastracco's
    ongoing injury. ........................................................................21

3.  Rejecting standing in this context effectively bars consumers
    from ever obtaining relief against misleading graphic matter
    on poultry product labels..........................................................23

4.  ALDF has sufficiently alleged the causation and redressability
    elements of Mastracco's standing. .............................................25

**B.**   **ALDF Sufficiently Alleged That Defendants' Approvals of
         Misleading Perdue Chicken Labels Injured Its Member.**..................27

1.  The District Court's mistaken reading of Mastracco's motive for
    purchasing chicken products infected its judgment on standing. ..............27

2.  ALDF alleged Mastracco suffered concrete consumer harm. ...................30

3.  If the allegations regarding Mastracco are insufficient, the Court
    should remand with leave to amend...........................................31

**CONCLUSION**..................................................................................32

# TABLE OF AUTHORITIES

## Cases

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015)...................................................................28

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................22

*Barber v. D.C. Gov't*,
  394 F. Supp. 3d 49 (D.D.C. 2019)........................................................28

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002).............................................................29

*Campaign Legal Ctr. v. Fed. Election Comm'n*,
  31 F.4th 781 (D.C. Cir. 2022).............................................................27

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983)...............................................................................22

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
  901 F.2d 107 (D.C. Cir. 1990).............................................................20

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
  793 F.2d 1322 (D.C. Cir. 1986)...........................................................20

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ...................................................... passim

*DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*,
  810 F.2d 1236 (D.C. Cir. 1987)...........................................................31

*Foman v. Davis,*
  371 U.S. 178 (1962).............................................................................32

*Friends of Animals v. Jewell*,
  824 F.3d 1033 (D.C. Cir. 2016)...........................................................27

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ................................................................19

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................9, 11

*Herbert v. Nat'l Acad. of Sciences*,
  974 F.2d 192 (D.C. Cir. 1992) ................................................27

*Hunt v. Washington State Apple Advertising Commission*,
  432 U.S. 333 (1977) ................................................................10

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. &*
  *Sales Pracs. Litig.*,
  No. 12-MD-2320-PB, 2015 WL 7282543 (D.N.H. Nov. 16, 2015) ............ 14, 17

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales*
  *Pracs. & Liab. Litig.*,
  903 F.3d 278 (3d Cir. 2018) ................................................15

*In re Navy Chaplaincy*,
  697 F.3d 1171 (D.C. Cir. 2012) ....................................... 22, 23

*John Doe v. U.S. Parole Comm'n*,
  602 F. App'x 530 (D.C. Cir. 2015) ........................................31

*Jones v. Quintana*,
  831 F. Supp. 2d 75 (D.D.C. 2011) ........................................28

*Kurtz v. Kimberly-Clark Corp.*,
  321 F.R.D. 482 (E.D.N.Y. 2017) ..........................................24

*Lilly v. Jamba Juice Co.*,
  No. 13-CV-02998-JST, 2015 WL 1248027
  (N.D. Cal. Mar. 18, 2015) ........................................... passim

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ....................................... 13, 25, 26, 29

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ................................................................26

*McNair v. Synapse Grp., Inc.*,
  672 F.3d 213 (3d Cir. 2012) ...............................................................15

*Meese v. Keene*,
  481 U.S. 465 (1987)................................................................. 19, 25

*Nat. Res. Def. Council v. EPA*,
  489 F.3d 1364 (D.C. Cir. 2007).........................................................19

*NB ex rel. Peacock v. District of Columbia*,
  682 F.3d 77 (D.C. Cir. 2012).............................................................30

*O'Shea v. Littleton*,
  414 U.S. 488 (1974)..........................................................................18

*Orangeburg v. FERC*,
  862 F.3d 1071 (D.C. Cir. 2017).........................................................20

*Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.,*
  No. CV147242DMGMANX, 2015 WL 12655594
  (C.D. Cal. Jan. 8, 2015) ...................................................................14

*Rayonier Inc. v. United States*,
  352 U.S. 315 (1957)..........................................................................31

*Richardson v. L'Oreal USA, Inc.*,
  91 F. Supp. 2d 181 (D.D.C. 2013)................................................ passim

*Ries v. Arizona Beverages USA LLC*,
  287 F.R.D. 523 (N.D. Cal. 2012)................................................. passim

*Shank v. Presidio Brands, Inc.*,
  No. 17-CV-00232-DMR, 2018 WL 1948830
  (N.D. Cal. Apr. 25, 2018) ............................................................ 14, 16

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)..........................................................................23

*Thornton v. Tyson Foods, Inc.*,
  28 F.4th 1016 (10th Cir. 2022) ......................................................3, 24

*True the Vote, Inc. v. Internal Revenue Serv.*,
   831 F.3d 551 (D.C. Cir. 2016)................................................................27

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*,
   412 U.S. 669 (1973)..........................................................................21

*Webb v. Trader Joe's Co.*,
   999 F.3d 1196 (9th Cir. 2021) ........................................................3, 24

*Weidenhamer v. Expedia, Inc.*,
   No. C14-1239RAJ, 2015 WL 1292978 (W.D. Wash. Mar. 23, 2015).......... 14, 22

*Zukerman v. U.S. Postal Serv.*,
   --F.4d--, 2023 WL 2939950 (D.C. Cir. Apr. 14, 2023).......................18

**Statutes**

5 U.S.C. § 551 ..................................................................................1

21 U.S.C. § 451 ...................................................................... passim

21 U.S.C. § 453(h)(1)................................................................ 2, 21, 24

21 U.S.C. § 453(s)..............................................................................2

21 U.S.C. § 457(c) ................................................................. 2, 21, 24

21 U.S.C. § 457(d) ................................................................. 2, 18, 25

21 U.S.C. § 458(a)(2) ......................................................... 2, 4, 21, 24

21 U.S.C. § 467e ................................................................. 3, 18, 24, 25

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1294(1) ..........................................................................1

28 U.S.C. § 1331 ...............................................................................1

**Rules**

Fed. R. Civ. Pro. 15(a)(2) ...............................................................31

**Regulations**

9 C.F.R. § 412.1 ................................................................................4

9 C.F.R. § 412.1(a) ...........................................................................2

9 C.F.R. § 412.1(c)(3) .......................................................................2

9 C.F.R. § 412.1(e) ...........................................................................3

## GLOSSARY

| | |
|---|---|
| ALDF | Animal Legal Defense Fund |
| FSIS | Food Safety Inspection Service |
| JA | Joint Appendix |
| PPIA | Poultry Products Inspection Act |
| USDA | United States Department of Agriculture |

## JURISDICTIONAL STATEMENT

Animal Legal Defense Fund ("ALDF") filed this action in the United States District Court for the District of Columbia on June 8, 2021, alleging violations of the Administrative Procedure Act, 5 U.S.C. §§ 551-801, and the Poultry Products Inspection Act, 21 U.S.C. §§ 451-72. The District Court had jurisdiction over the claims pursuant to 28 U.S.C. § 1331.

On November 14, 2022, the District Court entered a final order dismissing ALDF's claims, finding that the amended complaint failed to allege Article III jurisdiction. JA 110-133. ALDF filed a timely notice of appeal on January 12, 2023. Notice of Appeal, Dkt. 25. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 28 U.S.C. § 1294(1).

## STATEMENT OF THE ISSUES

The issues are:

**(1)** Whether the District Court erred in holding that ALDF lacks associational standing because it failed to allege sufficient facts to show that its member suffered an injury in fact.

**(2)** Whether the District Court erred in holding that ALDF failed to identify a cognizable injury based on a consumer's lack of confidence in the truthfulness of poultry product labeling.

1

## STATEMENT OF THE CASE

### A.      Statutory and Regulatory Background

Congress enacted the Poultry Products Inspection Act ("PPIA") to ensure

that chicken, turkey, and other poultry products distributed to the public are

"wholesome, not adulterated, and properly marked, labeled, and packaged." 21

U.S.C. § 451. The PPIA makes it unlawful to sell false or misleading poultry

products, deeming a product to be "misbranded" and prohibited from sale "if its

labeling is false or misleading in any particular." *Id*. §§ 457(c), 458(a)(2),

453(h)(1). The PPIA further defines a "label" as including "a display of written,

printed, or graphic matter" on a container. *Id*. § 453(s).

To prevent poultry products with false and misleading labels from entering

the market, Congress gave the U.S. Department of Agriculture ("USDA") the

authority to restrain distribution of products until "the marking, labeling, or

container is modified in such manner as [it] may prescribe so that it will not be

false or misleading." 21 U.S.C. § 457(d). USDA implements this authority through

a regulatory scheme commonly referred to as pre-market review, where it requires

all final labels except "generically approved labels" to be "submitted for approval"

to its Food Safety Inspection Service ("FSIS"). 9 C.F.R. § 412.1(a). An application

for label approval must include any "[s]pecial statements and claims" that will

appear on the label. *Id*. § 412.1(c)(3). "Special statements and claims" include

2

"claims, logos, trademarks, and other symbols" that the agency has not defined in regulations or its Food Standards and Labeling Policy Book, as well as "claims regarding the raising of animals," among others. *Id*. § 412.1(e).

The PPIA includes an express preemption clause that limits state law claims regarding misleading labels. States may not impose labeling requirements "in addition to, or different than," the PPIA's requirements. 21 U.S.C. § 467e. Courts have construed this language to mean that no state consumer challenges are permitted against FSIS-approved labels. *See, e.g.*, *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1203-04 (9th Cir. 2021); *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1024-25 (10th Cir. 2022). Thus, even an unlawful FSIS approval of a misleading poultry product label could preempt state consumer protection claims.

### B.    Factual Background

####    1.    FSIS approves Perdue labels depicting chickens and turkeys frolicking outside despite knowing that Perdue grows the birds indoors in windowless factories.

Agricultural giant Perdue Farms Inc. ("Perdue"), the fourth largest poultry production company in the United States, sells a variety of meat products in stores nationwide. JA 64-65, 73 (Am. Complaint ¶¶ 56-57, 99). Perdue markets several different chicken and turkey products, including whole chicken breasts, under its "Fresh Line" label. JA 66, 70 (Am. Complaint ¶¶ 64-66, 87).

The conditions in which Perdue raises chickens and turkeys for its Fresh Line products are grim. Fresh Line products come from Perdue's conventionally raised birds. JA 66 (Am. Complaint ¶ 64). Perdue's conventional production method crams massive numbers of chickens and turkeys into mostly windowless factories known as "grow-out facilities," where Perdue controls light and temperature conditions to turn the birds into a targeted quantity of meat as efficiently as possible. JA 66, 69 (Am. Complaint ¶¶ 63-64, 79-80). The birds never touch a blade of grass. JA 55 (Am. Complaint ¶ 8). Indeed, the only time that birds who become Fresh Line products might see the sun or feel a breeze is on the truck that drives them to the slaughterhouse. JA 69 (Am. Complaint ¶ 81).

Perdue must submit its labels for pre-market review to sell poultry products in stores across the country. *See* 21 U.S.C. § 458(a)(2). Defendants-Appellees FSIS, USDA, and Agriculture Secretary Vilsack (collectively, "Defendants") are responsible for approving label applications as part of this pre-market review. 9 C.F.R. § 412.1; JA 9-10 (Am. Complaint ¶¶ 38-40). Twice in 2018, Perdue submitted to FSIS sketch label applications for its Fresh Line—an application for whole chicken parts in May 2018 and a nearly identical application for fresh "cuts" in November 2018. JA 66, 67-68 (Am. Complaint ¶¶ 65-66, 73-76).

The label applications for the Fresh Line chicken and turkey products contained bucolic pastoral imagery. The labels' graphics show birds standing or

4

pecking outside of a barn, under the sun, surrounded by vegetation. JA 68, 70-71
(Am. Complaint ¶¶ 76, 87-88). A sketch of the label for Fresh Line chicken breasts
is below:



JA 112. The label graphics convey the idea that the chickens and turkeys used to
make Fresh Line products spent their days outdoors. JA 71 (Am. Complaint ¶¶ 88-
90).

Defendants should have known that the label images of chickens and turkeys
in vegetation outside a barn are misleading, given that USDA performs on-site
audits of Perdue's hatcheries, grow-out facilities, and slaughterhouses associated
with the company's conventionally raised chicken products. JA 67, 69-70 (Am.

Complaint ¶¶ 67-69, 74, 82-84). Yet FSIS approved both 2018 applications without requiring Perdue to make any changes to the graphic imagery on the labels. JA 67 (Am. Complaint ¶¶ 70-72) (approving May 2018 application on July 9, 2018), JA 68-69 (Am. Complaint ¶¶ 77-78) (approving November 2018 application on January 17, 2019).

   **2.** **FSIS rejects ALDF's request that it stop approving misleading Perdue labels and explains it does not consider graphic imagery when reviewing poultry labels.**

  ALDF found the Fresh Line labels misleading as soon as they appeared in the market. Perdue's own public-facing materials explained that around seventy-five percent of its grow-out facilities provide no access to the outdoors, and the twenty-five percent that provide access are likely for products labeled "organic" and "free range," not conventionally grown chickens and turkeys. JA 65-66 (Am. Complaint ¶¶ 60-63). ALDF commissioned a consumer survey of three labels from Perdue's Fresh Line products, which confirmed ALDF's suspicions. JA 71 (Am. Complaint ¶ 89). The survey found that nearly a third of consumers interpreted the Fresh Line labels to mean that the chickens used in the products were "given access to a barnyard/pasture." *Id*.

  Concerned with the labels' deceptive depictions, in January 2020, ALDF submitted to FSIS a request to deny any label application identical or substantially similar to the Fresh Line labels. JA 71 (Am. Complaint ¶ 90). Along with its

request, ALDF submitted a package of materials that included evidence of Perdue's production methods and ALDF's commissioned consumer survey data. JA 71 (Am. Complaint ¶¶ 88-89).

Via letter in March 2020, FSIS rejected ALDF's request. The letter, signed by Acting Assistant Administrator Rachel Edelstein, first stated that "the images [at issue] are not in violation [of] any FSIS labeling requirements and can be used on product." JA 72 (Am. Complaint ¶¶ 91-92). Second, Edelstein wrote that FSIS did not consider the bucolic imagery of the chickens and turkeys at all because the agency does not review label imagery: "photos, colors, and graphics used on packaging are not considered labeling claims and do not make the product false or misleading." JA 72 (Am. Complaint ¶ 93).

Perdue submitted another application for a Fresh Line label on September 1, 2020. The graphic imagery on the label application appeared identical to the imagery on the Fresh Line labels that FSIS approved in 2018 and 2019. JA 72 (Am. Complaint ¶ 95). FSIS approved the application on September 22, 2020, without considering the label's graphic imagery. JA 73 (Am. Complaint ¶¶ 97-98).

> **3.    ALDF member Marie Mastracco's purchases of deceptively labeled Perdue products destroy her confidence in the raising conditions of the products she buys.**

ALDF is a non-profit organization whose mission is to protect the lives and advance the interests of animals—including animals used to produce food—

through the legal system. JA 56-57 (Am. Complaint ¶¶ 15-16, 21). It has over 300,000 members nationwide. JA 56 (Am. Complaint ¶ 15). One such member is Marie Mastracco, whose consumer preferences align with ALDF's mission. JA 60 (Am. Complaint ¶ 31); JA 86.

Mastracco regularly purchased Perdue's Fresh Line chicken breasts to feed to her sick and elderly dog, Ozzie. JA 60 (Am. Complaint ¶ 31). In deciding which chicken breasts to purchase, Mastracco "relied on the products' labels to provide information" about the factors that went into her decision-making. *Id*. These factors included "whether the chickens raised for the meat were healthy, given any chemicals or hormones, *and treated humanely*," as well as whether they were given antibiotics. JA 60-61 (Am. Complaint ¶¶ 31-32) (emphasis added). Because she relied on Perdue's labels, Mastracco believed the Fresh Line products satisfied these factors—she interpreted the graphic imagery and "cage free" text on the label to mean that the chickens raised for the products roamed outside on pasture. *Id*. She was surprised and upset to learn that chickens used to make Fresh Line breasts are raised entirely indoors. *Id*.

Despite her surprise, shock, and upset feelings from learning about the misleading nature of the Perdue Fresh Line labels, Mastracco is compelled to continue buying chicken breasts to feed to her elderly dog. JA 61 (Am. Complaint ¶¶ 33-34). Yet she has no confidence in whether any labels in the market

8

accurately depict the chickens' raising conditions because FSIS's pre-market review repeatedly approved the Fresh Line labels and because FSIS has a pattern and practice of refusing to even look at the graphic images on poultry labels. *Id*.

### C.    Procedural Background

On June 8, 2021, ALDF initiated this action against the USDA, FSIS, and Agriculture Secretary Vilsack pursuant to the Administrative Procedure Act. ALDF alleged that Defendants' approval of the Perdue Fresh Line labels despite knowing the labels were misleading, as well as Defendants' pattern and practice of approving poultry product labels without reviewing graphic imagery, violated the PPIA and the Administrative Procedure Act. JA 24-26. The complaint alleged that ALDF had standing based solely on the organizational injury theory set forth in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

Defendants moved to dismiss the complaint on August 30, 2021, contending that ALDF did not have standing. Defendants contrasted ALDF's alleged organizational injury with the injury suffered by someone who was "an unwitting consumer of the poultry products at issue," suggesting that such a person would satisfy Article III standing. JA 38.

ALDF filed an amended complaint on September 9, 2021, identifying its member Mastracco as a misled consumer injured by Defendants' failure to properly review poultry product labels. JA 60-61 (Am. Complaint ¶¶ 30-37).  The

amended complaint alleged both *Havens* organizational injury and associational standing based on Mastracco's consumer injury. Defendants again filed a motion to dismiss, this time reversing their position on whether an "unwitting consumer" can allege standing. Defs. Second Mot. to Dismiss, Dkt. 15. Defendants argued that because ALDF's member Mastracco "now knows" the truth about the conditions of the chickens raised for the products at issue, she "can show no continuing injury or future injury relating to Perdue's Fresh Line chicken labels." *Id*. at 21-22.

On November 14, 2022, the District Court granted the second motion to dismiss and dismissed the case. JA 110-133. In its rejection of ALDF's associational standing, the District Court focused on one prong of the *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977), test: whether ALDF has a member who would otherwise have standing in her own right. JA 126. After finding ALDF sufficiently alleged it is a membership organization, the District Court held that ALDF's member Mastracco did not have standing on two grounds. First, it read the amended complaint to not allege that Mastracco intended to purchase chicken products based on representations of the chickens' free-roaming conditions. Second, it found that Mastracco's lack of confidence in the Perdue Fresh Line labels and all other poultry labels could not be a legally sufficient injury in fact. The District Court limited its opinion to injury in

10

fact and did not discuss the causation and redressability elements of Mastracco's standing. *Id*. at 126-131.[1]

## SUMMARY OF ARGUMENT

ALDF brought this case against Defendants to stop them from continuing to approve misleading Perdue Fresh Line labels and from ignoring graphic imagery when they review poultry product label applications for approval. Its amended complaint alleged associational standing based on its member's consumer injury. Specifically, ALDF alleged that Defendants' approval decisions caused its member Marie Mastracco to lose confidence in whether any poultry product labels, including the Fresh Line labels she had been purchasing, accurately represent animal raising conditions. ALDF also alleged that Mastracco has a continuing need to purchase chicken breasts despite her lack of confidence in all such labels. These facts, when taken as true, plead ongoing injury sufficient for ALDF to have standing to seek injunctive relief. Nevertheless, the District Court dismissed the amended complaint. It erroneously reasoned that Mastracco could not challenge Defendants' practice of approving poultry product labels—including Perdue Fresh Line labels—without considering the accuracy of their graphic imagery because she is now aware the Fresh Line labels are misleading. The District Court also

---

[1] The District Court also held that ALDF did not sufficiently allege *Havens* organizational standing. ALDF does not appeal that issue.

ignored ALDF's allegations of how Mastracco considered animal raising imagery on the labels to make her purchasing decisions, instead cabining her purchases as solely reliant on Perdue's antibiotics claims.

ALDF pled associational standing sufficient to survive a motion to dismiss. First, Mastracco's injury is a lack of confidence in the truthfulness of poultry product labels, an injury that both prevents her from relying on Perdue Fresh Line labels' veracity as well as from knowing if the graphic material on any market competitors' labels is accurate. She has lost faith in making any purchases with confidence the labels will be truthful, as required under the PPIA—a type of concrete injury recognized by numerous federal courts across the country. Second, ALDF sufficiently alleged Mastracco relied on Perdue's Fresh Line labels to convey information about animal raising conditions, a factor she considered when choosing which product to purchase. By ignoring this allegation in favor of a narrow reading of ALDF's complaint, the court failed to afford Mastracco the lenient standard of review applicable on a motion to dismiss.

This Court should reverse the District Court's decision, hold that ALDF has sufficiently alleged Article III standing at the motion to dismiss stage, and remand the case for continued litigation of the merits.

## ARGUMENT

### A.    A Misled Consumer Who Lacks Confidence in Purchasing Decisions Can Have Standing.

The sole issue on appeal is whether, at the motion to dismiss stage, ALDF sufficiently alleged it has a member with standing to sue in her own right. To have standing, one must plead: an injury in fact that is concrete and particularized and actual or imminent; that the injury is fairly traceable to the defendant's challenged actions; and that the injury is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In its ruling, the District Court erroneously concluded that ALDF failed to allege sufficient facts showing that its member suffered an injury in fact. JA 126-131. Because ALDF properly alleged its member suffered consumer injury, it has standing.

### 1.    Mastracco's inability to rely on product labeling with any confidence is a concrete and imminent injury.

ALDF alleged consumer injury based on its member's lack of confidence in whether any poultry product labels accurately represent the birds' raising conditions, a harm emanating from Defendants' failure to police misleading labels. JA 61 (Am. Complaint ¶ 34). This theory of standing is widely recognized. Many federal courts, including a district court in this Circuit, have held that a consumer's inability to rely on the truthfulness of a product's labeling is a concrete and imminent injury. *See Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th

13

Cir. 2018) (holding that plaintiff deceived by misleading labeling had standing to seek injunctive relief where she alleged "she faces a threat of imminent or actual harm by not being able to rely on [defendant's] labels in the future"); *Richardson v. L'Oreal USA, Inc*., 991 F. Supp. 2d 181, 194 (D.D.C. 2013) (same); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012) (same).[2]

The District Court found that Mastracco had not suffered a concrete injury, reasoning that because she now knows that the Perdue label's depictions of chickens on pasture do not represent reality, she "cannot rely on that imagery [] and be harmed by such reliance[.]" JA 128-29. Courts have directly rejected this reasoning, noting problems with its logic:

> When a consumer discovers that a representation about a product is false, she doesn't know that another, later representation by the same manufacturer is also false. She just doesn't know whether or not it's true. A material representation injures the consumer not only when it is untrue, but also when it is unclear whether or not [it] is true.

*Lilly v. Jamba Juice Co*., No. 13-CV-02998-JST, 2015 WL 1248027, at *3 (N.D. Cal. Mar. 18, 2015).

---

[2] *Shank v. Presidio Brands, Inc*., No. 17-CV-00232-DMR, 2018 WL 1948830, at *5 (N.D. Cal. Apr. 25, 2018) (allegations sufficient to "confer standing to seek injunctive relief, because Shank alleges that he will not be able to trust Presidio's claims about Every Man Jack products"); *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Pracs. Litig.*, No. 12-MD-2320-PB, 2015 WL 7282543, at *4 (D.N.H. Nov. 16, 2015) (same); *Weidenhamer v. Expedia, Inc*., No. C14-1239RAJ, 2015 WL 1292978, at *5 (W.D. Wash. Mar. 23, 2015) (same); *Pierce-Nunes v. Toshiba Am. Info. Sys., Inc.,* No. CV147242DMGMANX, 2015 WL 12655594, at *2–3 (C.D. Cal. Jan. 8, 2015) (same).

The leading decision explaining Mastracco's form of consumer injury comes from the Ninth Circuit Court of Appeals. In *Davidson v. Kimberly-Clark Corp.*, that court held that previously deceived consumers are likely to suffer an imminent injury when they intend to purchase the product again. 889 F.3d at 970–72. Such consumers suffer an ongoing injury because now that they know a product's advertising is misleading, they are unable to rely on it when making future purchasing decisions. *Id*. This Circuit Court of Appeals has not yet said whether consumer confusion can give rise to injury in fact, leaving *Davidson* as the primary authority on this theory.[3]

In *Davidson*, the Ninth Circuit provided non-exhaustive illustrations of how consumer confusion can create injury in fact, concluding it was "not persuaded that injunctive relief is *never* available for a consumer who learns after purchasing a product that the label is false." 889 F.3d at 969–70 (internal quotation marks and citation omitted). When it described various consumer harms that would suffice for

---

[3] The Third Circuit has diverged from the Ninth Circuit, concluding that consumers who find out that a product was misleadingly advertised yet intend to purchase the product again do not have standing to seek injunctive relief. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Liab. Litig.*, 903 F.3d 278, 292 (3d Cir. 2018); *McNair v. Synapse Grp., Inc.*, 672 F.3d 213, 227 (3d Cir. 2012). These cases are distinguishable, however, because plaintiffs there did not allege the ongoing injury of an inability to rely on the truthfulness of future product advertising. *Johnson & Johnson*, 903 F.3d at 292-93. In both cases, plaintiffs merely asserted they would buy the exact same product again, despite being "already aware of the allegedly deceptive business practices." *Id*.

15

standing, *Davidson* cited *Ries* and *Richardson*—cases demonstrating the Catch-22 form of consumer harm confronting Mastracco. *See id*. at 970 (explaining how in some cases injury can happen when a consumer "will not purchase the product although she would like to," or in others when she does again purchase the product without knowing whether it has improved).

The facts of *Ries* illustrate how consumer lack of confidence in accurate advertising can create injury. 287 F.R.D. at 533. In *Ries,* the consumer plaintiffs alleged that defendants falsely labeled their AriZona Iced Tea products "All Natural" even though they contained artificial ingredients. *Id*. at 537. Defendants contended that because plaintiffs were now aware of the product's ingredients, they could no longer be deceived by the "All Natural" label. *Id*. at 533. Rejecting this argument, the court held that "the fact that [plaintiffs] discovered the supposed deception . . . does not render the advertising any more truthful." *Id*. The court concluded that plaintiffs had Article III standing to seek injunctive relief, finding that their inability to rely on the veracity of the brand's labeling in the future with any confidence was "the harm California's consumer protection statutes are designed to redress." *Id.*; *see also Shank,* 2018 WL 1948830, at *1, *5 (plaintiff who was unable to trust defendant's marketing after purchasing product containing synthetic ingredients with misleading plant imagery and the word "natural" on the label had standing to seek injunctive relief).

16

This reasoning is not confined to Ninth Circuit courts. In *Richardson*, which pre-dates *Davidson*, the plaintiffs alleged that L'Oreal described some of its products as "salon only" when in fact they were sold in mass-market retail stores. 991 F. Supp. 2d. at 187–88. The District of Columbia federal district court rejected L'Oreal's argument that plaintiffs could not suffer future injury because they now knew that the products are not exclusively sold in salons. *Id*. at 194. It held, "[Plaintiffs] will be harmed—without an injunction—by not being able to rely on the 'salon-only' label with any confidence." *Id*. Similarly, in *In re Colgate-Palmolive Softsoap*, the plaintiffs alleged that Colgate's advertising was misleading because it suggested that Softsoap Antibacterial had superior health benefits despite containing a potentially unsafe ingredient. 2015 WL 7282543, at *1. The District of New Hampshire district court found that plaintiff's lack of confidence in the truthfulness of Colgate's marketing and label was an imminent injury that conferred standing for injunctive relief. *Id*. at *4.

ALDF's allegations of consumer harm fall squarely within this line of authority. Mastracco, like the consumer plaintiffs in these cases, knows that the graphics depicting chickens on a bucolic pasture on Perdue Fresh Line product labels are deceptive. JA 60 (Am. Complaint ¶ 32). She also knows that despite the misleading imagery, Defendants approved the labels anyway. JA 61 (Am. Complaint ¶ 34). As a result, she cannot rely on the truthfulness of poultry product

17

labeling in the future. *Id*. Her confusion about whether poultry product labels are accurate confers standing to seek injunctive relief because it is a "continuing, present adverse effec[t]" of Defendants' failure to police the truthfulness of such labels. *See Richardson*, 991 F. Supp. 2d at 191, 195 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)); *see also Zukerman v. U.S. Postal Serv.*, --F.4d--, 2023 WL 2939950, at *4–5 (D.C. Cir. Apr. 14, 2023) (harm inflicted by the agency's unlawful action and the continuing effects of that harm were sufficient to find plaintiff had standing for injunctive relief).

In fact, Mastracco's injury is even more concrete and imminent than that of consumers who allege confusion over a single company's product line. Thanks to Defendants' (in)actions, she cannot rely on the truthfulness of *any* poultry product labeling, whether it be affixed to Perdue's or Perdue competitors' chicken and turkey products. FSIS has repeatedly allowed misleading Perdue Fresh Line chicken labels to enter into, and remain in, the market, despite being confronted with information showing consumers find the label deceptive. *See* JA 69-71, 73 (Am. Complaint ¶¶ 82-86, 88-90, 97). More broadly, FSIS admitted that it has a policy of not evaluating whether the graphic matter on *any* poultry product labels is misleading, despite its exclusive statutory authority and obligation to do so. JA 72 (Am. Complaint ¶¶ 91–94); 21 U.S.C. §§ 451, 457(d), 467e. As a result, poultry producers like Perdue have free rein to "provid[e] [consumers] with misleading

18

information and depriv[e] them of their ability to make an informed decision about how to best spend their money." *Lilly*, 2015 WL 1248027, at *5.

Mastracco now faces the dilemma of either (1) purchasing Perdue chicken products that she currently understands to be raised inhumanely, against her consumer preferences, or (2) purchasing a different company's chicken product that she has no way of knowing was raised humanely. Either way, she will suffer injury.[4]

Should Mastracco purchase Perdue Fresh Line chicken breasts, she will be injured by purchasing a product that is anathema to her ethical views. JA 60 (Am. Complaint ¶ 32); *cf. Meese*, 481 U.S. at 473–76. Alternatively, she would suffer injury when purchasing another brand of chicken products: given Defendants' pattern and practice of approving all poultry labels without reviewing the graphic

---

[4] The only other alternative that Mastracco has would be to avoid purchasing chicken products altogether—a Hobson's choice, considering her compulsion to buy chicken breasts for her dog's health. JA 60-61 (Am. Complaint ¶¶ 31-34). The Supreme Court has recognized that a person suffers an injury in fact when they "curtail" activities that serve their interests due to a defendant's continued illegal conduct. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183–184 (2000) (plaintiffs who curtailed their enjoyment of a river due to defendant's continued pollutant discharges suffered an injury in fact); *Meese v. Keene*, 481 U.S. 465, 473–76 (1987) (plaintiff had standing to challenge government labeling three films as "political propaganda" because he "could not exhibit the films without incurring a risk of injury to his reputation and of an impairment of his political career"); *see also Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1371 (D.C. Cir. 2007) (plaintiff who curtailed her outdoor activities due to hazardous air pollution had standing).

imagery (including imagery on Perdue's misleading Fresh Line labels), she has no way of knowing whether any labels accurately depict the way the chickens were raised. *See Davidson*, 889 F.3d at 971–72.

Defendants' failure to review graphic imagery also means that Mastracco has a reduced chance of purchasing products with labels that do accurately reflect her preferences. This Court has repeatedly recognized that "[t]he lost opportunity to purchase a desired product is a cognizable injury[.]" *Orangeburg v. FERC*, 862 F.3d 1071, 1078 (D.C. Cir. 2017); *see also Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 112–113 (D.C. Cir. 1990) (petitioners' reduced opportunity to purchase vehicles that matched their preferences was a cognizable injury); *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 793 F.2d 1322, 1332 (D.C. Cir. 1986) (same).

This type of injury was also recognized in *Lilly*, where the Northern District of California district court discussed the opportunity costs incurred by consumers who are unable to rely on the veracity of product labeling. 2015 WL 1248027, at *4. In *Lilly*, the court noted that a seller might change its product to conform to the label, realizing that there is market demand for the product as labeled. *Id*. However, a consumer who was misled in the past "won't know whether it makes sense to spend her money on the product, since she will suspect a continuing misrepresentation" and "probably *won't* buy it – *even though it is now precisely the*

*product she wants above all others*." *Id*. at *4. Here, Perdue competitors who understand consumer demand for humanely raised chickens may have products on the market with labels that accurately depict chickens out on pasture—or Perdue may even change its practices—and Mastracco would not know to choose those products because she no longer trusts any poultry product labeling. *See also Richardson*, 991 F. Supp. 2d. at 195 (noting that plaintiffs would have no way of knowing whether changes in a company's practices would "boos[t] the label's veracity").

In sum, ALDF has demonstrated that Mastracco is "adversely affected" by defendants' unlawful approvals and that she has a "direct stake in the outcome of the litigation" beyond a "mere interest in the problem." *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973). Defendants' pattern of approving misleading poultry product labels prevents Mastracco from making informed choices among the competing products in the marketplace, the very injury that the PPIA's prohibition on false and misleading labeling is "designed to redress." *Ries*, 287 F.R.D. at 533; *see also* 21 U.S.C. §§ 451, 457(c), 458(a)(2), 453(h)(1).

### 2. ALDF is entitled to injunctive relief based on Mastracco's ongoing injury.

ALDF's allegations that Mastracco is a regular purchaser of Perdue Fresh Line chicken breasts and that she "feels compelled to continue purchasing whole

21

chicken breasts" to meet her dog's health needs suffice to establish a likelihood of

future harm. JA 60-61 (Am. Complaint ¶¶ 31-34). The constitutional test for

standing to seek prospective injunctive relief is whether the plaintiff is "likely" to

suffer future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983); *In re

Navy Chaplaincy*, 697 F.3d 1171, 1175-76 (D.C. Cir. 2012) (injunctive relief

turned on whether defendants' selection boards were "likely to discriminate against

plaintiffs"). Further, a plausible basis for injunctive relief is all that is required at

the motion to dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Courts have found that plaintiffs have standing to seek injunctive relief even

when it is not obvious from the pleadings that plaintiffs would continue purchasing

the deceptively labeled products. For example, in *Ries*, the court found that

because the plaintiffs had repeatedly purchased the products in the past and

"neither of them disclaimed an interest in purchasing" defendant's products in the

future, they plausibly alleged they were likely to suffer future harm. 287 F.R.D. at

533. Similarly, in *Richardson*, the court found that because it was able to "infer"

plaintiffs' intent to purchase the challenged products in the future from the record,

"requiring them to amend their complaint to strengthen those allegations would

waste the resources of the parties and of this Court." 991 F. Supp. 2d at 195; *see

also Weidenhamer*, 2015 WL 1292978, at *5 (finding sufficient allegations of

22

future intent to use defendant's product based on "his request for a 5% 'credit' rather than a refund").

Here, ALDF's allegations go far beyond *not disclaiming* an interest in purchasing poultry products with FSIS-approved labels. The amended complaint alleges Mastracco has repeatedly purchased Perdue Fresh Line chicken breasts and is "compelled to purchase whole chicken breasts." JA 60-61 (Am. Complaint ¶¶ 31, 34). Indeed, the District Court found that Mastracco "has continued (and presumably will continue) to purchase Perdue Fresh Line chicken." JA 129; *cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 495–96 (2009) (plaintiff lacked standing for injunctive relief where court was left to assume he might "stumble across a project tract" within 190 million acres of forest). These ongoing purchases plus FSIS's pattern and practice of approving poultry labels without reviewing graphic imagery makes Mastracco's future injury likely: "The prospect of future injury becomes significantly less speculative where, as here, plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury." *In re Navy Chaplaincy*, 697 F.3d at 1177.

### 3. Rejecting standing in this context effectively bars consumers from ever obtaining relief against misleading graphic matter on poultry product labels.

In enacting the PPIA, Congress deemed it "essential in the public interest that the health and welfare of consumers be protected by assuring that poultry

products distributed to them are . . . properly . . . labeled." 21 U.S.C. § 451. To fulfill this essential consumer interest, Congress prohibited sales or distribution of poultry products under "false or misleading" labeling. *Id.* § 457(c); *see also id.* §§ 458(a)(2), 453(h)((1).

Yet the District Court's overly narrow construction of Article III standing effectively precludes misled consumers from challenging the poultry product labels that deceived them. Because a consumer will only bring suit after discovering she was misled, under the District Court's reasoning, no consumer can seek redress for violation of the very law designed to protect her. *See Ries*, 287 F.R.D. at 533 (citation omitted) ("[W]ere the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result."); *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 542 (E.D.N.Y. 2017) (same); *Richardson*, 991 F. Supp. 2d 194 (same).

The result is even more "unrealistic" in the context of poultry labels: consumers have *no* judicial redress of false or misleading poultry labeling because the PPIA's pre-market review regulatory scheme and express preemption clause work together to prevent consumers from challenging FSIS-approved labels under state consumer protection laws. 21 U.S.C. § 467e; *see, e.g.*, *Thornton*, 28 F.4th at 1024–25; *Webb*, 999 F.3d at 1203–04. Such an outcome would increase deceptive

24

labeling on the market, precluding consumer challenges to misleading labeling when, as here, FSIS wrongly approves them.

**4.    ALDF has sufficiently alleged the causation and redressability elements of Mastracco's standing.**

In addition to plausibly alleging that she suffered an injury in fact, ALDF has also alleged the causation and redressability elements sufficient for Mastracco's standing. *See Lujan*, 504 U.S. at 560–61. Mastracco's injury is directly traceable to Defendants' abdication of statutory duties because they have exclusive authority to ensure that the poultry products that enter the market are not false or misleading. 21 U.S.C. §§ 451, 457(d), 467e. Defendants' repeated approvals of deceptive Fresh Line labels and policy of not evaluating whether poultry label graphics are false and misleading have prevented Mastracco from discerning whether any chicken labels accurately convey her preferred product: meat from animals raised in humane conditions. JA 61 (Am. Complaint ¶ 34).

ALDF's requested relief would remedy Mastracco's injury by vacating FSIS's approval of Perdue's misleading poultry labels and requiring the agency to review graphic imagery when assessing whether labels are false or misleading. JA 61 (Am. Complaint ¶¶ 35-36). Judicial relief would eliminate Mastracco's need to choose blindly between chicken products that may contravene her interest in purchasing humanely raised chicken. *See Meese*, 481 U.S. at 476–77 (holding that injunction against the government labeling certain films as "political propaganda,"

would "eliminate the need to choose between exhibiting the films and incurring the risk that public perception of this criminal enforcement scheme will harm appellee's reputation").

If injunctive relief is granted, Mastracco and other consumers would be able to rely on poultry product labels and make informed decisions about which of the "alternative goods competing for their dollars" they purchase. *Lilly* 2015 WL 1248027, at \*4–5 ("injunctive relief enables the Plaintiffs and other consumers to have confidence that the information they receive about the challenged products at the time of purchase is accurate."); *Davidson*, 889 F.3d at 972 (injunction "would likely redress [plaintiff's] injury by requiring that Kimberly–Clark only make truthful representations on their wipe products upon which [plaintiff] could reasonably rely").[5]

---

[5] In addition, because the PPIA affords consumers like Mastracco a procedural right in ensuring that FSIS is reviewing the accuracy of all aspects of poultry product labels, the normal standards for redressability and immediacy are relaxed. *Lujan*, 504 U.S. at 572 n.7. The litigant has standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 517–18 (2007) (citations omitted). A vacatur of Perdue Fresh Line product approvals and an order requiring FSIS to consider the graphic imagery on all poultry product labels will require the agency to "reconsider" whether poultry product labels are false and misleading. ALDF easily clears the lower redressability standard. *Id*.

**B.    ALDF Sufficiently Alleged That Defendants' Approvals of Misleading Perdue Chicken Labels Injured Its Member.**

"This court reviews a District Court decision on standing *de novo*." *Campaign Legal Ctr. v. Fed. Election Comm'n*, 31 F.4th 781, 788 (D.C. Cir. 2022) (citing *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016)). This standard applies regardless of whether the district court relied on the complaint alone "or on the complaint supplemented by undisputed facts evidenced in the record." *True the Vote, Inc. v. Internal Revenue Serv.*, 831 F.3d 551, 555 (D.C. Cir. 2016) (such review is "*de novo*") (cleaned up) (citing *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

**1.    The District Court's mistaken reading of Mastracco's motive for purchasing chicken products infected its judgment on standing.**

The District Court erred in its assessment of ALDF's associational standing by misreading undisputed facts. ALDF pled that "[i]n deciding which chicken breasts to purchase, Mastracco considered factors such as whether the chickens raised for the meat were . . . treated humanely," and "[s]he relied on the products' labels to provide information about" that treatment. JA 60 (Am. Complaint ¶ 32). Yet the District Court hinged its injury analysis on ALDF's additional allegation that Mastracco was also "influenced" by the products' antibiotic claims. *Id*. From

27

this, the District Court concluded that antibiotic claims "ultimately led her to purchase" the products. JA 128 (citing Am. Complaint ¶ 32).

By misreading ALDF's pleadings, the District Court inverted the standard applicable to review of a motion to dismiss. At this stage, a court must accept "all well-pleaded factual allegations . . . as true," and "draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). Yet the District Court ignored part of the amended complaint to find Mastracco had not relied on graphic depictions of humane living conditions when purchasing Perdue Fresh Line products. By ignoring ALDF's allegation that Mastracco considered whether the chickens used in poultry products "were . . . treated humanely," JA 60 (Am. Complaint ¶ 32), the District Court failed to account for the entirety of ALDF's allegations detailing the factors Mastracco considered in purchasing Perdue products—including imagery depicting how the animals were raised. *See Jones v. Quintana*, 831 F. Supp. 2d 75, 87 (D.D.C. 2011) (denying motion to dismiss where defendant "fundamentally misconstrues or ignores the well-pleaded allegations" by cherry picking complaint, where "the full panoply of factual allegations" supported claim); *Barber v. D.C. Gov't*, 394 F. Supp. 3d 49, 58 (D.D.C. 2019) (Jackson, K.B., J.) (rejecting defendants' revision of the factual allegations used to prove standing because it "improperly ignores the Court's duty to accept the allegations of the complaint as true and to construe the

28

complaint liberally at the motion-to-dismiss stage") (citing *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002)).

ALDF's allegations established Mastracco's reliance on humane imagery. Yet the District Court's analysis neither read ALDF's standing allegations in the light most favorable to it nor drew reasonable inferences in its favor. The mere existence of another factor—antibiotic claims—that ALDF alleged influenced Ms. Mastracco's decision to purchase the Perdue products does not render the District Court's reliance on that factor alone proper. The entirety of the allegations show concrete injury, from explicit allegations that Mastracco considered humane living conditions in making her purchase, JA 60 (Am. Complaint ¶ 31), to reasonable inferences of that motive from allegations that she was harmed when she became "upset" at learning the graphic's depictions of the animals' conditions were false, JA 60 (Am. Complaint ¶ 32). Yet rather than "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (cleaned up), the District Court isolated ALDF's broad allegations and confined Mastracco's reliance to only one of several factors ALDF alleged. Requiring ALDF to spell out additional allegations of Mastracco's injury ignores the standard of review at the motion to dismiss stage, where "'the burden imposed' on plaintiffs to establish standing 'is not onerous,' and 'general factual allegations

of injury . . . suffice.'" *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (internal citations omitted).

### 2.    ALDF alleged Mastracco suffered concrete consumer harm.

The amended complaint makes clear Mastracco purchased Perdue Fresh Line products because of misrepresentations of the animals' living conditions. The District Court admitted such a purchase is a type of concrete harm that constitutes cognizable injury. In assessing her standing, the District Court conceded injury may exist "if purchasing free-roaming chicken was Mastracco's aim—if that was *the* factor that drew her to purchase Fresh Line products in the first place . . . ." JA 129 (emphasis added). This is met here: Mastracco would not have purchased the Perdue Fresh Line products without the labels' graphic representations of humane living conditions. JA 60 (Am. Complaint ¶¶ 30-32).

As explained above, Mastracco suffers the same lack of confidence in label advertising as what sufficed for standing in *Richardson*. In *Richardson*, the plaintiffs had standing because they were deceived by haircare products labeled "salon-only" and would continue to suffer such harm by not being able to rely on the label with any confidence. The District Court distinguished ALDF's allegations by finding "Ms. Mastracco was never misled in the first place" since "[n]ot once did she purchase the poultry products at issue because she relied on the cartoon chickens or turkeys on the package." JA 131. The misidentification of how

30

Mastracco relied on the products' labels caused the District Court to wrongly differentiate this case from *Richardson*. *See also supra*, Argument Section A.1. The District Court thus erroneously dismissed the amended complaint. *See Rayonier Inc. v. United States*, 352 U.S. 315, 320–21 (1957) (vacating decision dismissing complaint for failure to state a claim where lower courts "improperly interpreted certain allegations in the complaints and as a result of such misinterpretation incorrectly applied Washington law in passing on the sufficiency of these allegations").

### 3.     If the allegations regarding Mastracco are insufficient, the Court should remand with leave to amend.

Alternatively, if the Court finds that ALDF's factual allegations do not suffice for associational standing, ALDF respectfully requests leave to amend its complaint. Fed. R. Civ. Pro. 15(a)(2) (leave to amend should be "freely given" in the interests of justice). If the Court is uncertain whether it has jurisdiction over ALDF's claims, granting leave to amend is proper to allow plaintiff to clarify its basis for standing. *See John Doe v. U.S. Parole Comm'n*, 602 F. App'x 530, 531 (D.C. Cir. 2015) (granting leave to amend as the "default option" when the Court is uncertain of its authority to hear plaintiff's claims); *see also DKT Mem'l Fund, Ltd. v. Agency for Int'l Dev.*, 810 F.2d 1236, 1239 (D.C. Cir. 1987) (allowing plaintiffs to amend their complaint after the district court found plaintiffs lacked

standing because they failed to allege injury in fact). As the Supreme Court has held, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis,* 371 U.S. 178, 182 (1962).

## CONCLUSION

This Court should reverse the District Court's order granting Defendants' motion to dismiss for lack of standing and remand the case to the District Court for further proceedings.

Dated: April 18, 2023

Respectfully submitted,

*/s/ Daniel H. Waltz*
Daniel H. Waltz
ANIMAL LEGAL DEFENSE FUND
700 Pennsylvania Ave. SE
Washington, DC 20003
dwaltz@aldf.org
(707) 795-2533

Caitlin Foley
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive Suite 2400
Chicago, IL 60606
cfoley@aldf.org

Emily Stewart
ANIMAL LEGAL DEFENSE FUND
888-C 8th Avenue, #419
New York, NY 10019
estewart@aldf.org

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULES OF APPELLATE PROCEDURE 32(a)(7)(B) & 32(g)

I hereby certify that the foregoing brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 32(g). As calculated by my word processing software (Microsoft Word for Office 365), the brief contains 7,323 words.

Dated: April 18, 2023                     */s/ Daniel H. Waltz*
                                          Daniel H. Waltz

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2023, I am electronically filing this brief through the ECF system, which will send a notice of electronic filing to counsel for all parties in this case.

*/s/ Daniel H. Waltz*
Daniel H. Waltz

## ADDENDUM OF PERTINENT STATUTES AND REGULATIONS

**Poultry Products Inspection Act, 21 U.S.C. Ch. 10.**

### 21 U.S.C. § 451. Congressional statement of findings.

Poultry and poultry products are an important source of the Nation's total supply of food. They are consumed throughout the Nation and the major portion thereof moves in interstate or foreign commerce. It is essential in the public interest that the health and welfare of consumers be protected by assuring that poultry products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. Unwholesome, adulterated, or misbranded poultry products impair the effective regulation of poultry products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged poultry products, and result in sundry losses to poultry producers and processors of poultry and poultry products, as well as injury to consumers. It is hereby found that all articles and poultry which are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce, and that regulation by the Secretary of Agriculture and cooperation by the States and other jurisdictions as contemplated by this chapter are appropriate to prevent and eliminate burdens upon such commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers.

### 21 U.S.C. § 453. Definitions.

For the purposes of this chapter--

[. . .]

**(h)** The term "misbranded" shall apply to any poultry product under one or more of the following circumstances:

    **(1)** if its labeling is false or misleading in any particular;

    [. . .]

**(s)** The term "label" means a display of written, printed, or graphic matter upon any article or the immediate container (not including packaged liners) of any article; and the term "labeling" means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.

[. . .]

35

**21 U.S.C. § 457. Labeling and container standards.**
[. . .]

**(b) Labeling requirements; definitions and standards of identity or composition or articles and standards of fill of container; standards consistent with Federal Food, Drug, and Cosmetic Act; consistency between Federal and State standards.**

The Secretary, whenever he determines such action is necessary for the protection of the public, may prescribe: (1) the styles and sizes of type to be used with respect to material required to be incorporated in labeling to avoid false or misleading labeling in marking and labeling any articles or poultry subject to this chapter; (2) definitions and standards of identity or composition or articles subject to this chapter and standards of fill of container for such articles not inconsistent with any such standards established under the Federal Food, Drug, and Cosmetic Act, and there shall be consultation between the Secretary and the Secretary of Health and Human Services prior to the issuance of such standards under either Act relating to articles subject to this chapter to avoid inconsistency in such standards and possible impairment of the coordinated effective administration of this chapter and the Federal Food, Drug, and Cosmetic Act. There shall also be consultation between the Secretary and an appropriate advisory committee provided for in section 454 of this title, prior to the issuance of such standards under this chapter, to avoid, insofar as feasible, inconsistency between Federal and State standards.

**(c) Use of trade names; false or misleading marking or labeling; misleading form or size of container**

No article subject to this chapter shall be sold or offered for sale by any person in commerce, under any name or other marking or labeling which is false or misleading, or in any container of a misleading form or size, but established trade names and other marking and labeling and containers which are not false or misleading and which are approved by the Secretary are permitted.

**(d) Withholding use of false or misleading mark, label, or container size or form; modification; hearing; conclusiveness of determination; appeal**

If the Secretary has reason to believe that any marking or labeling or the size or form of any container in use or proposed for use with respect to any article subject to this chapter is false or misleading in any particular, he may direct that such use be withheld unless the marking, labeling, or container is modified in such manner as he may prescribe so that it will not be false or misleading. If the person using or proposing to use the marking, labeling, or

container does not accept the determination of the Secretary, such person may request a hearing, but the use of the marking, labeling, or container shall, if the Secretary so directs, be withheld pending hearing and final determination by the Secretary. Any such determination by the Secretary shall be conclusive unless, within thirty days after receipt of notice of such final determination, the person adversely affected thereby appeals to the United States Court of Appeals for the circuit in which such person has its principal place of business or to the United States Court of Appeals for the District of Columbia Circuit. The provisions of section 194 of Title 7 shall be applicable to appeals taken under this section.


### 21 U.S.C. § 458. Prohibited acts.

**(a)** No person shall--

**(1)** slaughter any poultry or process any poultry products which are capable of use as human food at any establishment processing any such articles for commerce, except in compliance with the requirements of this chapter;

**(2)** sell, transport, offer for sale or transportation, or receive for transportation, in commerce, (A) any poultry products which are capable of use as human food and are adulterated or misbranded at the time of such sale, transportation, offer for sale or transportation, or receipt for transportation; or (B) any poultry products required to be inspected under this chapter unless they have been so inspected and passed;

**(3)** do, with respect to any poultry products which are capable of use as human food, any act while they are being transported in commerce or held for sale after such transportation, which is intended to cause or has the effect of causing such products to be adulterated or misbranded;

**(4)** sell, transport, offer for sale or transportation, or receive for transportation, in commerce or from an official establishment, any slaughtered poultry from which the blood, feathers, feet, head, or viscera have not been removed in accordance with regulations promulgated by the Secretary, except as may be authorized by regulations of the Secretary;

**(5)** use to his own advantage, or reveal other than to the authorized representatives of the United States Government or any State or other government in their official capacity, or as ordered by a court in any judicial proceedings, any information acquired under the authority of

this chapter concerning any matter which is entitled to protection as a trade secret.

[. . .]

**21 U.S.C. § 467e. Non-Federal jurisdiction of federally regulated matters; prohibition of additional or different requirements for establishments with inspection services and as to marking, labeling, packaging, and ingredients; recordkeeping and related requirements; concurrent jurisdiction over distribution for human food purposes of adulterated or misbranded and imported articles; other matters.**

Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of paragraph (b) of section 460 of this title, if consistent therewith, with respect to any such establishment. Marking, labeling, packaging, or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce) in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this chapter, but any State or Territory or the District of Columbia may, consistent with the requirements under this chapter exercise concurrent jurisdiction with the Secretary over articles required to be inspected under this chapter for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States. This chapter shall not preclude any State or Territory or the District of Columbia from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.

**Regulatory Requirements Under the Federal Meat Inspection Act, the Poultry Products Inspection Act, and the Egg Products Inspection Act, 9 C.F.R. Ch. III, Subch. E.**

### 9 C.F.R. § 412.1. Label approval.

**(a)** No final label may be used on any product unless the label has been submitted for approval to the FSIS Labeling and Program Delivery Staff, accompanied by FSIS Form 7234–1, Application for Approval of Labels, Marking, and Devices, and approved by such staff, except for generically approved labels authorized for use in § 412.2. The management of the official establishment or establishment certified under a foreign inspection system, in accordance with parts 327 and 381, subpart T, must maintain a copy of all labels used, in accordance with parts 320 and 381, subpart Q, of this chapter. Such records must be made available to any duly authorized representative of the Secretary upon request.

**(b)** All labels required to be submitted for approval as set forth in paragraph (a) of this section will be submitted to the FSIS Labeling and Program Delivery Staff. A parent company for a corporation may submit only one label application for a product produced in other establishments that are owned by the corporation.

**(c)** The Food Safety and Inspection Service requires the submission of labeling applications for the following:

> **(1)** Sketch labels as defined in paragraph (d) of this section for products which are produced under a religious exemption;
> **(2)** [Reserved by 88 FR 2811]
> **(3)** Special statements and claims as defined in paragraph (e) of this section and presented in the context of a final label.
> **(4)** Requests for the temporary use of final labels as prescribed in paragraph (f) of this section.

**(d)** A "sketch" label is the concept of a label. It may be a printer's proof or equivalent that is sufficiently legible to clearly show all labeling features, size, and location. The Food Safety and Inspection Service will accept sketches that are hand drawn or computer generated, or other reasonable facsimiles that clearly reflect and project the final version of the label.

**(e)** "Special statements and claims" are statements, claims, logos, trademarks, and other symbols on labels as defined in this paragraph (e).

> **(1)** The following are considered special statements and claims:

39

**(i)** Those not defined in the Federal meat and poultry products inspection regulations or the Food Standards and Labeling Policy Book;

**(ii)** "Natural" claims, regardless of whether they are defined in the Food Standards and Labeling Policy Book; and

**(iii)** Health claims (including graphic representations of hearts), ingredient and processing method claims (e.g., high-pressure processing), structure-function claims, claims regarding the raising of animals (e.g., "no antibiotics administered"), products labeled as organic (except for those where only individual ingredients are labeled as organic), and instructional or disclaimer statements concerning pathogens (e.g., "for cooking only" or "not tested for E. coli O157:H7").

**(2)** The following are not considered special statements and claims:

**(i)** Allergen statements (e.g., "contains soy") applied in accordance with the Food Allergen Labeling and Consumer Protection Act;

**(ii)** Negative claims regarding ingredients not listed in the ingredients statement (e.g., "No MSG Added," "Preservative Free," "No Milk," "No Pork," or "Made Without Soy");

**(iii)** Statements that characterize a product's nutrient content in compliance with Title 9 of the CFR, such as "low fat"; and

**(iv)** Claims related to geographical significance, such as "German Brand Made in the US," or those that make a country of origin statement on the label of any meat or poultry product "covered commodity,"1 or displays of geographic landmarks, such as a foreign country's flag, monument, or map.